**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

RONALD DAVIS,

                *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL SECURITY,

                *Defendant*.

_____/

CASE NO. 1:17-cv-14115

DISTRICT JUDGE THOMAS L. LUDINGTON

MAGISTRATE JUDGE PATRICIA T. MORRIS

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS
MOTIONS FOR SUMMARY JUDGMENT (R. 14, 17)**

## I.     RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports Defendant Commissioner of Social Security's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (R. 14), be **DENIED**, the Commissioner's Motion, (R. 17), be **GRANTED**, and the Commissioner's final decision denying benefits be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Referral, (R. 3), this case was referred to me to review the Commissioner's final decision denying Plaintiff's claim for Title II Disability Insurance Benefits (DIB). The case is presently before the Court upon the parties' cross-motions for summary judgment. (R. 14, 17.)

1

Plaintiff filed his present application for DIB on December 29, 2014, alleging that his disability began August 26, 2014. (R. 8, PageID.148.) The Commissioner denied the claim. (R. 8, PageID.88-93.) Plaintiff then requested a hearing before an Administrative Law Judge (ALJ), (R. 8, PageID.99), which occurred on June 22, 2016. (R. 8, PageID.57-86.) The ALJ issued a decision on September 9, 2016, finding Plaintiff not disabled during the relevant period. (R. 8, PageID.43-53.) On October 16, 2017, the Appeals Council denied review, (R. 8, PageID.24-26), and Plaintiff filed for judicial review on December 20, 2017. (R. 1). He moved for summary judgment on June 4, 2018, (R. 14), and the Commissioner countered with its own Motion three months later, (R. 17). The case is now ready for resolution.

### B.   Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker*

2

*v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not

"try the case de novo, nor resolve conflicts in the evidence, nor decide questions of

credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

If the Commissioner's decision is supported by substantial evidence, "it must be affirmed

even if the reviewing court would decide the matter differently and even if substantial

evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.      Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*,

475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any
> medically determinable physical or mental impairment which
> can be expected to result in death or which has lasted or can be
> expected to last for a continuous period of not less than [twelve]
> months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to

be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If
> you are doing substantial gainful activity, we will find that you
> are not disabled.
>
> (ii) At the second step, we consider the medical severity of your
> impairment(s). If you do not have a severe medically
> determinable physical or mental impairment that meets the
> duration requirement . . . or a combination of impairments that
> is severe and meets the duration requirement, we will find that
> you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of
> your impairment(s). If you have an impairment(s) that meets or
> equals one of our listings in appendix 1 of this subpart and
> meets the duration requirement, we will find that you are

disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)). The RFC "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

4

**D.    ALJ Findings**

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (R. 8, PageID.43-53.) At step one, the ALJ found that the last date Plaintiff could claim insurance for (i.e., the last date of insured status) was December 31, 2014, and that he had not engaged in substantial gainful activity between that date and his alleged onset date of August 26, 2014. (R. 8, PageID.45.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: left shoulder osteoarthritis, "status post left shoulder replacement," degenerative disc disease, and paracentral herniated disc L5-S1. (R. 8, PageID.22.) At step three he decided these impairments did not meet or equal a listed impairment. (R. 8, PageID.46.)

Before proceeding to the final steps, the ALJ found that Plaintiff had the residual functional capacity (RFC) to perform

> light work as defined in 20 CFR 404.1567(b) except he requires an ability to stand and walk no more than six hours in an eight-hour day. He could sit up to six hours of an eight-hour day. Lifting is limited to 20 pounds occasionally, and 10 pounds frequently. He could never push or pull with the left upper extremity. Kneeling, crouching, crawling, bending, climbing, and squatting would be limited to occasional.

(R. 8, PageID.47.) At step four, the ALJ found Plaintiff unable to perform any past relevant work. (R. 8, PageID.51.) Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy. (R. 8, PageID.51-52.)

**E.    Administrative Record**

**1.    Medical Evidence**

In October 2009, Plaintiff had chest and head x-rays after a few fainting episodes;

the results were normal (except for mild sinus issues not relevant here). (R. 8, PageID.203-205.) Later in the month, after a bout of intractable coughing, results from imaging studies of his chest again were normal. (R. 8, PageID.209.)

The record then jumps to December 2012, when imaging of his left shoulder showed degenerative changes, spurring, and mild acromiclavicular joint hypertrophy, but no "acute osseous or articular abnormality." (R. 8, PageID.211.)

Next is a report from March 2013 that Plaintiff had facial swelling. (R. 8, PageID.213; *see also* R. 8, PageID.217 (noting in review of systems "arthritis and Left Shoulder").) Relevant here, the diagnoses included hypertension (which had been "controlled" by the time of discharge) and "osteoarthritis left shoulder with osteophytes." (*Id.*) His neck was supple, with painless range of motion, and no abnormalities were noted in his extremities; he also had normal motor skills, strength, and sensation. (R. 8, PageID.214, 217.)

Moving forward another year, to June 2014, Plaintiff had a CT scan of his lumbar spine to assess his back pain. (R. 8, PageID.221.) It found "normal alignment of the lumbar vertebral bodies and disc," mild diffuse disc bulges at L3 through L5, "small right paracentral disc herniation at L5-S1," and, confusingly, "no evidence of spondylolysis or spondylolisthesis" but "[m]ild spondylosis" at the L3 and L4 vertebra. (*Id.*) At worst, Plaintiff reported back pain at 10 out of 10 on a visual analog scale; but it was presently at 2; his shoulder pain could shoot to 8 out of 10, but currently it had settled at 2 or 3. (R. 8, PageID.223.) Sometimes his fingers tingled in his left hand, and sometimes his back pain immobilized him. (*Id.*)

A month later, the range of motion in his cervical and lumbar spine was restricted, as was the range in his left shoulder. (R. 8, PageID.228.) Without medication, his pain reached 8 out of 10; with it, the pain slumped to 3. (R. 8, PageID.231.) More imaging studies confirmed osteoarthritic changes in the left shoulder but no other issues in the shoulder or his chest. (R. 8, PageID.233-235.) He was placed on various pain medications. (R. 8, PageID.241.)

In August 2014, he underwent left shoulder resurfacing. (R. 8, PageID.244-251.) The surgery report characterized Plaintiff's osteoarthritis as severe and said it caused "severe restriction of [range of motion] with severe pain." (R. 8, PageID.251.) During the procedure and at its completion, the shoulder's range of motion was examined and found to be "dramatically improved." (R. 8, PageID.256.) After the procedure, he felt "a little pain," rated at 3 out of 10. (R. 8, PageID.246.) The post-surgery physical examination did not flag any abnormalities and he was able to walk, but the examination does not appear to have been extensive (for example, it provides no indication of strength or range of motion). (R. 8, PageID.247-248.) The prothesis placed in the shoulder was in "good position," according to imaging studies. (R. 8, PageID.250.)

On discharge he was prescribed pain medication, along with a home care nurse. (R. 8, PageID.249.) A week later, returning for more pain medication, he estimated his pain was at 2 or 3 out of 10. (R. 8, PageID.260.) At his next visit his pain remained at level 3. (R. 8, PageID.263.)

The remaining records come from after Plaintiff's last insured date of December 31, 2014. (R. 8, PageID.45.) In February 2015 the pain was at 5 to 8 out of 10, although he did

not report new weaknesses nor were any found on examination (but his spine was still tender). (R. 8, PageID.364.) The straight-leg raise test was negative. (*Id.*) He received a lumbar injection. (R. 8, PageID.368.)

In June 2015 he sought treatment for his lumbar back, rating the pain at 5 to 8 out of 10 and noting it crept into his legs. (R. 8, PageID.294.) On examination, his lumbar back had diffuse tenderness "but no new motor neurologic deficit in the upper or lower extremities" and his straight-leg raises were negative. (*Id.*)[1] His legs also hurt and felt numb. (R. 8, PageID.280.) He received steroid injections for his axial lumbar-back pain, although he observed that in the past the injections had not eliminated the pain. (*Id.*) The neurologic examinations, administered both before and after the injection, were stable, and he could wiggle his toes and walk unassisted. (*Id.*) Around the same time, he signed up for physical therapy to address lumbar radiculopathy, back pain, and myofascial pain. (R. 8, PageID.285-286.)

He continued to complain of pain a few months later, requesting refills on pain medication and a referral to a new specialist. (R. 8, PageID.296-300, 304.) By the following month, in September 2015, he had run out of medication and needed another refill. (R. 8, PageID.306.) His neurological and musculoskeletal examinations, however, produced normal results. (R. 8, PageID.302, 305, 337.)

The pain worsened in December, at which time he was taking Aleve and Ibuprofen but not the prescription pain medication. (R. 8, PageID.307.) The previous physical therapy

---

[1] "A straight leg raise is positive if pain in the sciatic distribution is reproduced between 30 [degrees] and 70 [degrees] . . . ." Cathy Speed, *ABC of Rheumatology: Low Back Pain*, 328 Brit. Med. J. 1119, 1120 (2004).

sessions "help[ed] a little," only temporarily, and nothing alleviated the pain, which flared with any movement or positioning. (R. 8, PageID.309.) On examination, his back was tender, range of motion tests produced pain, and his straight leg raises were positive. (*Id.*) However, his gait, reflexes, and motor strength were normal. (*Id.*) He was prescribed pain medication, (*id.*), which he depleted after seven days, (R. 8, PageID.330.)

A month after his medication ran out, he saw a pain management specialist, claiming that his back and hand pain had worsened and that medicine did not help. (R. 8, PageID.330, 335.) His lumbar spine was tender and he had positive Tinel's sign, (R. 8, PageID.332), a test commonly used to measure carpel tunnel syndrome, J.D. Stewart & A. Eisen, *Tinel's sign and the carpal tunnel syndrome*, Brit. Med. J. 1125, 1125 (Oct. 21, 1978). The notes also state, "Low Back Numbness or Weakness Thigh and Leg and Right and Left." (R. 8, PageID.332.)

In February 2016 he received treatment for carpel tunnel syndrome. (R. 8, PageID.329.) The following month he had another lumbar epidural. (R. 8, PageID.325.) In April 2016, he was again prescribed pain medications, but the doctor also discussed non-compliance and drug rehabilitation referral, encouraging him to find a new pain management facility. (R. 8, PageID.316.) The pain medication regimen would start out with narcotics, but only three weeks' worth, after which he could only have non-narcotic treatment. (*Id.*)

### 2.    Function Form

On February 5, 2015, Plaintiff completed a function form as part of his DIB application. (R. 8, PageID.174-180.) In it, he claimed disability attributable to back and

9

shoulder pain, and also hernias. (R. 8, PageID.174.) During a typical day, he took pain medication and stretched; the form says both that he did not take care of anyone else or any pets and that his wife helped him take care of them. (R. 8, PageID.175.) His conditions kept him up at night, though he had no problems with personal care, such as shaving, dressing, and bathing, and could complete these tasks and take his pain medication without reminders. (R. 8, PageID.175-176.) He prepared his own meals, mostly by microwave, and could do most indoor and outdoor chores, taking a little extra time because of fatigue. (R. 8, PageID.176.) He could leave the house alone, which he did daily, usually by driving, and he could shop in stores. (R. 8, PageID.177.) Financial responsibilities, such as paying bills and using a checkbook, were not difficult.[2] (*Id.*) Hobbies included television, playing sports, hunting, and landscaping—his answers indicate both that he did not participate in these "as often or as long" and that of these hobbies he now only watched television. (R. 8, PageID.178.) His physical conditions did not prevent him from getting along well with others (and "very well" with authority figures) and having a social life, which included sports, video games, and talking, but social activities occurred less often. (R. 8, PageID.178-180.)

He wrote that his conditions affected the following abilities: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, and completing tasks, but not using his hands. (R. 8, PageID.179.) Despite saying he had trouble completing tasks, he also stated he finished what he started and followed instructions well.

---

[2] He did, however, check the box indicating he could not handle a savings account, but in the space provided for explaining his "NO" answer, he said "can handle savings." (R. 8, PageID.177.)

(*Id.*) One block was the farthest he could walk before resting. (*Id.*) He did not use any assistive devices except for glasses. (R. 8, PageID.180.)

### 3.    Administrative Hearing

Plaintiff testified that his previous work involved driving trucks, which sometimes (but rarely) required him to lift up to 40 pounds. (R. 8, PageID.63.) In 2009, he stopped working, "[p]artially" because of a hernia operation "and then my shoulder and my back" made the work too difficult. (R. 8, PageID.65.) When he moved or bent, back pain struck, starting in his buttocks and shooting down to his foot. (R. 8, PageID.66.) As for his shoulder, it went numb after 20 minutes of movement or even just holding the steering wheel; his fingers became numb too. (*Id.*) His hernia "hurts from time to time," but "mainly my back and then my shoulder" were what prevented him from working. (*Id.*)

In fact, he had turned down a landscaping job because of the pain. (R. 8, PageID.74.) Nor would he be able to return to trucking since he had back and leg restrictions. (R. 8, PageID.75.) If he were to work, he would need to rest for 15 to 20 minutes every hour because his back would ache, then his leg would numb, and his left wrist and fingers would also go numb if he was using that arm. (R. 8, PageID.76.) Any job that required sitting, walking, or standing would aggravate his back and leg, even if he could sit or stand at his option; sooner or later, he would need to lie down. (*Id.*) His medications, too, would dull him and cause him to be less alert than necessary. (R. 8, PageID.77.)

His shoulder surgery in 2014 gave him slightly more movement yet did not reduce the pain. (R. 8, PageID.67.) The shots for carpal tunnel syndrome wore off quickly, as did the back injections. (R. 8, PageID.68, 72.) He took three medications, which could make

11

him "hazy" and nauseated. (R. 8, PageID.71.) While sitting at the hearing, he had stretched his left leg because it ached and went numb. (R. 8, PageID.72-73.)

He lived with his mother-in-law and children; the older child helped with the younger one. (R. 8, PageID.69.) During the day, he did "dishes and stuff" for about 15 to 20 minutes before resting. (R. 8, PageID.70, 74.) He also helped prepare his son for school, "meals and so forth," but the son helped him too. (*Id.*) He bathed and dressed "[v]ery slowly," finding it difficult to bend. (R. 8, PageID.73.) He could occasionally lift 5 or 10 pounds—about a gallon of milk, he estimated—from a level surface, but not the floor. (*Id.*) On particularly active days—when he moved "stuff around the house," cleaned, or did laundry—he needed rest breaks, sometimes on the couch, other times in bed. (R. 8, PageID.74, 75.)

> The ALJ then asked the vocational expert (VE) to
>
> assume an individual who is currently 51 years old and possesses the same educational background and work history as Mr. Davis. Assume an ability to stand and walk no more than six hours in an eight hour day.
>
> The individual could sit up to six of eight hours. Lifting would be limited to 20 pounds occasionally, and 10 pounds frequently. No pushing or pulling with the left upper extremity.
>
> Kneeling, crouching, crawling, bending, climbing and squatting would be limited to occasionally.

(R. 8, PageID.79.) While that person could not perform Plaintiff's past work, the VE testified, other jobs existed that he could perform: information clerk (4,400 positions in southeastern Michigan, 960,000 nationally), and order caller (6,400 positions in southeastern Michigan, 2.8 million nationally). (R. 8, PageID.79-80.) If the individual

needed to take at least 2 unscheduled breaks of 15 to 20 minutes, he could not maintain employment. (R. 8, PageID.80.) But if he only needed to alternate between sitting and standing, he could still work in both positions, although the numbers might be slightly lower. (R. 8, PageID.80-81, 84-85.) Off-task time could be up to 20 percent, otherwise it would preclude work. (R. 8, PageID.81.)

Plaintiff's attorney then asked whether an employer would provide orthopedic appliances, which he described as a "biomechanical chair to sit in so that he would have . . . comfort while seated." (R. 8, PageID.82-83.) The VE responded that it would depend on the individual employer, thus making the number of available positions unquantifiable. (R. 8, PageID.82-84.)

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations[3] carve the evidence into "acceptable

---

[3]  Various amendments have been made to the regulations since Plaintiff filed his claim. *See, e.g.*, Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (January 18, 2017) (effective March 27, 2017). Because the changes do not alter the outcome here—and, relatedly, they do not appear to exercise an impermissible retroactive effect on Plaintiff's rights, as the amendments are largely procedural changes in the process for analyzing evidence, *cf. Combs v Comm'r of Soc. Sec.*, 459 F.3d 640, 647 (6th Cir, 2006)—and the parties do not discuss them, it is unnecessary to determine whether they apply. Therefore, like many other courts, I will utilize the regulations in effect when Plaintiff filed his claim and the case was decided by the ALJ, along with the new regulations that explicitly apply to claims during this period. *See, e.g.*, 20 C.F.R. § 404.1527; *see generally* Revisions to Rules Regarding the Evaluation of Medical Evidence, 81 Fed. Reg. 62560, 62578 (September 9, 2016); *see also Rodriguez v. Colvin*, 3:15CV1723, 2018 WL 4204436, at *4 n. 6 (D. Conn. 2018) ("[T]he Court reviews the ALJ's decision under the earlier regulations because the plaintiff's application was filed before the new regulations went into effect." (citing *Maloney v. Berryhill*, No. 16-cv-3899, 2018 WL 400772, at *1 (E.D. N.Y. 2018) (same))); *Miller v. Comm'r of Soc. Sec.*, No.

medical sources" and "other sources." 20 C.F.R. § 404.1513 (2016). "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a) (2016). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d) (2016). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).   Both   "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

---

1:17CV0718, 2018 2773372, at *5 n. 3 (N.D. Ohio 2018) ("Plaintiff's claim was filed before March 27, 2017, and the ALJ's decision was rendered before the new regulations took effect. For the sake of consistency, the court continues to cite the language from the former regulations that were in effect at the time of the ALJ's decision."), *rep. & rec. adopted by* 2018 WL 2766020 (N.D. Ohio 2018); *Woodall v. Berryhill*, No. 1:17-cv-01289, 2018 WL 3133442, at *7 n. 3 (N.D. Ohio 2018) (applying the rules effective when the claimant applied for benefits), *rep. & rec. adopted by* 2018 WL 3126552 (N.D. Ohio 2018); *Meeks v. Comm'r of Soc. Sec.*, No. 4:17-cv-45, 2018 WL 1952529, at *4 n. 2 (E.D. Tenn. 2018) (applying the rules effective when the ALJ decided the case).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed his claim before March 27, 2017, he is entitled to the benefit of the treating-source rule.  Under that rule, certain opinions from his treating physicians can receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d). Thus, the ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight

assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must also analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996).[4] Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

---

[4] Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation has remained materially unchanged, *see* 20. C.F.R. § 404.1529(c), and I agree with the courts in this District that have continued to apply SSR 96-7p to cases arising prior to its rescission. *See, e.g., Cooper v. Comm'r of Soc. Sec.*, No. 16-cv-13477, 2017 WL 3923984, at *3 (E.D. Mich. August 21, 2017), *Rep. & Rec. adopted by* 2017 WL 3891971 (E.D. Mich. Sept. 9, 2017); *Tuttle v. Comm'r of Soc. Sec.*, No. 16-11144, 2017 WL 2928021, at *6 n. 3 (E.D. Mich. June 9, 2017), *Rep. & Rec. adopted by* 2017 WL 2905125 (E.D. Mich. July 7, 2017).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective, confirming evidence forces the ALJ to consider various factors. 20 C.F.R. § 404.1529(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994).

### G.    Analysis

Plaintiff presents three arguments, each of which I address in turn.

1.    **SSR 83-20p**

Plaintiff argues that the ALJ violated Social Security Ruling 83-20 by "bas[ing] her findings regarding the onset date on a negative inference she inferred that Plaintiff was not disabled based on the lack of evidence of disability during the relevant period." (R. 14, PageID.396.) Further, he notes that objective evidence is unnecessary, and that the evidence here demonstrated the "progression of the impairments," citing the shoulder resurfacing, a February 2015 CT scan of his back demonstrating mild disc bulges, his back injections, and his physical therapy. (*Id.*)

SSR 83-20 is meant to be used "when establishing the onset date of disability." SSR 83-20, 1983 WL 31249, at *1 (Jan. 1, 1983). This determination can sometimes be difficult due to the limited evidence available:

> If reasonable inferences about the progression of the impairment cannot be made on the basis of the evidence in file and additional relevant medical evidence is not available, it may be necessary to explore other sources of documentation. Information may be obtained from family members, friends, and former employers to ascertain why medical evidence is not available for the pertinent period and to furnish additional evidence regarding the course of the individual's condition.

*Id.* at *3. This Ruling, according to Plaintiff, fits the present case, and the ALJ erred by not developing the record and "seeking clarification or guidance regarding whether the disabling impairment existed prior to the expiration of Plaintiff's insured status." (R. 18 at 18.)

The first problem with Plaintiff's position, as Defendant points out, is that the Ruling "applies only when there has been a finding of disability and it is necessary to determine when the disability began." *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997);

18

*see also Seeley v. Comm'r of Soc. Sec.*, 600 F. App'x 387, 392 (6th Cir. 2015) (same); *Nix v. Barnhart*, 160 F. App'x 393, 396-397 (6th Cir. 2005) (finding that SSR 83-20 was not violated because the ALJ declined to find disability, thus "no inquiry into an onset date was required"); *Scheck v. Barnhart*, 357 F.3d 697, 701 (7th Cir. 2004) ("The ALJ did not find that Scheck was disabled, and therefore, there was no need to find an onset date. In short, SSR 83-20 does not apply."). For example, in the case Plaintiff cites, the ALJ found the plaintiff disabled but rejected an earlier onset date because the record from that time lacked medical evidence. *Houston v. Comm'r of Soc. Sec.*, No. 10–cv–14831, 2011 WL 6152992, at *11-12 (E.D. Mich. Sept. 30, 2011), *rep. & rec. adopted by* 2011 WL 6152982 (E.D. Mich. Dec. 9, 2011).

Here Plaintiff has not been found disabled under any Title of the Social Security Act or in any previous application. *Cf. Martin v. Comm'r of Soc. Sec.*, No. 12-14773, 2014 WL 1048150, at * (E.D. Mich. 2014) (noting that SSR 83-20 applied when the ALJ found no severe impairments at step two on the present application but the claimant had been previously found disabled in an earlier application). Consequently, the Ruling does not apply to Plaintiff.

Even so, Plaintiff's brief analysis of the evidence is misdirected. The Ruling contemplates obtaining evidence "from family members, friends, and former employers" to help establish an *onset* date. SSR 83-20, 1983 WL 31249, at *3. Instead, Plaintiff cites medical evidence—which, if probative, would obviate the need for Ruling's endorsement of lay evidence—almost all of which comes from well after the onset date and into the post-insured period.

19

This approach suffers from multiple problems. First, Plaintiff fails to disclose what other evidence, aside from the few pieces he cites, the ALJ should have obtained or relied on to determine the disability's onset. Second, and more significantly, Plaintiff ignores the Ruling's focus on the onset date. He makes no attempt to explain how his evidence, mostly developed after the alleged onset date, bears upon the inception of his disability. Even if it did, Plaintiff is silent on why or how the ALJ misinterpreted it. The decision acknowledged the surgery, the injections, and many imaging studies. (R. 8, PageID.47-48.) It nonetheless reasoned that these materials failed to establish disability in light of Plaintiff's non-compliance with treatments, ability to handle daily activities, and the lack of any restrictions recommended by treating doctors, among other things. (R. 8, PageID.49-51.) This presents valid and substantial evidence supporting the ALJ's conclusion.

Third, out of the records he cites, only the surgical reports come from the insured status period. "Evidence of disability obtained after the expiration of insured status is generally of little probative value." *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 845 (6th Cir. 2004). Such evidence is usually irrelevant unless it relates back to the insured period. *Moran v. Comm'r of Soc. Sec.*, 40 F. Supp 3d 896, 920-921 (E.D. Mich. 2014). Plaintiff does not explain how the evidence is relevant to the onset date or the insured-status period. The period was a blip, lasting only about four months, so the later-dated materials might be needed here. But that does not make them more probative, nor does Plaintiff explain how they relate to the insured status period.

Thus, because Plaintiff was not found disabled, SSR 83-20 is inapplicable, and in any event his argument on the merits is unpersuasive.

## 2.    Medical Equivalence to a Listing

Plaintiff's full second argument is as follows:

> There was no qualified medical expert opinion on the issue of medical equivalence in the record of this case. Without the opinion of an Orthopedic Specialist, Pain Management Expert or Neurologist, the Administrative Law Judge is not qualified to offer her medical opinion in lieu of an expert. See *Barnett v. BHarnhart* [*sic*], 381 F.3d 664, 670 (7th Cir. 2004). While the issue may not have been addressed correctly, it is generally accepted that when the issue has not been reviewed by an expert Plaintiff's case should be remanded for further consideration.

(R. 14, PageID.396-397.) Thus, Plaintiff does not say what listings should have been considered, what the ALJ's analysis was, under what caselaw "it is generally accepted" that remand is required, or whether the lack of expert opinion is harmless. In fact, Plaintiff papers over the last point and seems to equivocate on whether any error occurred, noting only that the ALJ "may" have erred and that in any case remand is the better course.

Such a flimsy argument flirts with waiver. *See McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones."). But he did mention—without any analysis—listing 1.04 in his pre-hearing brief and again at the hearing, (R. 8, PageID.61, 201), and he is generally correct that the lack of expert opinion on equivalence merits remand. *See Moran v. Comm'r of Soc. Sec.*, 40 F. Supp. 3d 896, 923 (E.D. Mich. 2014). Consequently, I will address the argument.

Claimants with impairments meeting or equaling a listing are deemed disabled at step three without further analysis. 20 C.F.R. § 404.1520(a)(4)(iii). Each listing contains specific criteria that the claimant must satisfy to this step. 20 C.F.R. § 404.1525(c) (2016). When the criteria are not met, a claimant might still be rendered disabled by impairments

equal to the listings. This equivalence comes in three scenarios:

> (1) the claimant has a listed impairment but does not exhibit the specified severity or findings, yet has "other findings" that are "at least of equal medical significance" to the criteria; (2) the claimant has a non-listed impairment that is at least of equal medical significance" to a listed impairment; or (3) the claimant has a combination of impairments which do not individually meet a Listed Impairment, but are "at least of equal medical significance" to a listing when viewed in totality.

*Reynolds v. Comm'r of Soc. Sec.*, 424 Fed.Appx. 411, 414 n. 2 (6th Cir.2011) (quoting 20 C.F.R. § 404.1526 (2011)).

At step three, ALJs retain discretion to accept or reject medical opinions on equivalence without attaching "any special significance to the source of an opinion . . . ." 20 C.F.R. § 404.1527(d)(3). But that discretion is qualified by SSR 96-6p, 1996 WL 374180, at *3, which describes the "longstanding policy requir[ing] that the judgment of a physician (or a psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight." *See also* 20 C.F.R. § 404.1526(c) (noting that when addressing equivalence, "[w]e also consider the opinion given by one or more medical or psychological consultants designated by the Commissioner"). "[F]indings by a Single Decision Marker[] ('SDM') do not constitute medical opinion evidence" for purposes of the equivalence inquiry. *Bukowski v. Comm'r of Soc. Sec.*, No. 13–cv–12040, 2014 WL 4823861, at *4 (E.D. Mich. Sept. 26, 2014).

The underlying concern prompting the need for expert guidance is that equivalence represents a complex medical determination beyond the ALJ's ken. *See Moran*, 40 F. Supp. 3d at 924. Accordingly, courts often remand when the record lacks an expert opinion on

22

the topic. *See Id.* at 923 (collecting cases).

Nonetheless, the burden at step three remains on the plaintiff and, consequently, the ALJ's failure to consult experts about equivalence has been held irrelevant when the plaintiff fails to meet the burden. *See Buchanon v. Comm'r of Soc. Sec.*, No. 13-CV-14288, 2015 WL 927831, at *7 (E.D. Mich. Mar. 4, 2015) ("Even if the ALJ should have considered an expert medical opinion on the issue of equivalence, remand is not warranted because it is plaintiff who bears the burden to prove that she has an impairment(s) listed in, or medically equal to one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, and for the reasons set forth above, plaintiff has failed to satisfy that burden here."). In other words, "The lack of a medical opinion on equivalence can be deemed harmless error in some cases." *Bukowski*, 2014 WL 4823861, at *4; *see also Rice v. Comm'r of Soc. Sec.*, No. 16-11330, 2017 WL 4925681, at *7 (E.D. Mich. Aug. 25, 2017) ("While it is a rare case that [an equivalence] determination can be made without a medical opinion, given the dearth of objective medical evidence in this case suggesting that plaintiff's impairments separately or in combination could meet or equal a Listing, the undersigned finds that the failure to obtain a medical opinion on equivalence is in fact, harmless error.").

To demonstrate that an error harmed their, plaintiffs must provide more than speculations that they might have succeeded absent the error; they must assemble evidence and provide reasons why. *See Cortes v. Comm'r of Soc. Sec.*, No. 15-14064, 2017 WL 941833, at *5 (E.D. Mich. Feb. 22, 2017) (citing *Shinseki v. Sanders*, 556 U.S. 396, 410 (2009) ("[I]t normally makes sense to ask the party seeking reversal to provide an explanation, say, by marshaling the facts and evidence showing the contrary."). As the

23

Sixth Circuit noted,

> A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a "substantial question" as to whether he has satisfied a listing. . . . Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing. . . . Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three.

*Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432-433 (6th Cir. 2014) (citations omitted).

In this case, no expert medical opinion on equivalence appears in the record. An SDM evaluated listings 1.02 and 1.04 at the initial stage, (R. 8, PageID.90-91), but her opinion is not enough under SSR 96-6p and the regulations. *See Bukowski*, 2014 WL 4823861, at *4. Thus, the ALJ erred by determining equivalency without any expert guidance.

The question becomes whether this error is harmless. Plaintiff does not tackle this issue, simply noting instead that remand is "generally accepted." (R. 14, PageID.397.) His argument fails to cite any listings, let alone evidence showing his impairments equal specific listing criteria. Nor does he explain any errors or flaws in the ALJ's step three analysis. In short, he offers nothing to show prejudice and, as a result, his argument should be rejected.

To be sure, the ALJ's discussion of the listings is short, not even mentioning the specific listings she considered. (R. 8, PageID.47.) Yet, as noted, Plaintiff does not argue that the discussion was inadequate aside from the lack of expert opinion on equivalency. Additionally, the ALJ canvassed the relevant evidence when formulating the RFC. *Cf.*

24

*Bukowski*, 2014 WL 4823861, at *3 ("[D]istrict courts in this circuit have consistently found that an ALJ is 'under no obligation to spell out "every consideration that went into the step three determination" or "the weight he gave each factor in his step three analysis," or to discuss every single impairment.'" (citation omitted)); *id.* ("'The ALJ did not err by not spelling out every consideration that went into the step three determination . . . . The ALJ described evidence pertaining to all impairments, both severe and non-severe, for five pages earlier in his opinion and made factual findings.'" (citing *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006))).

More importantly, a glance at listings 1.02 and 1.04 removes all doubt that the error was harmless. (R. 17, PageID.417-420.) Start with listing 1.02, which Plaintiff never brought up but the SDM considered and Defendant discusses. That listing is

> [c]haracterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A.   Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
>
> or
>
> B.   Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. pt. 404, subpt. P, App. 1-Part-A1, § 1.02 (Sept. 2016). Effective ambulation requires the ability "to carry out activities of daily living . . . without companion assistance." *Id.* § 1.00(B)(2)(b)(2). Ineffective ambulation occurs when, for example, the

claimant needs assistive devices, cannot use public transportation, or cannot shop. *Id.* "Inability to perform fine and gross movements effectively means an extreme loss of function in both upper extremities . . . that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." *Id.* § 1.00(B)(2)(c). Examples include "the inability to prepare a simple meal and feed oneself, [and] he inability to take care of personal hygiene[.]" *Id.*

Beginning from the top, the record mentions joint-space narrowing only once, (R. PageID.211), and contains no evidence of any maladies at the level of "gross anatomical deformity." As for the requirements in listing 1.02(A), the few medical records that mention his gait or ability to walk give no indication of problems, whether from "major peripheral weight-bearing joint[s]" or otherwise. (R. 8, PageID.247-248, 280, 309.) He did not use assistive devices and could drive and shop by himself. (R. 8, PageID.177.) Thus, there is no evidence of ineffective ambulation. Nor does evidence support him meeting listing 1.02(B). While he had surgery on one shoulder and claimed carpal tunnel syndrome—which the ALJ rated as non-severe, (R. 8, PageID.46), a finding Plaintiff does not dispute—nothing suggests that both arms suffered from ineffective fine and gross movements. As the ALJ observed, Plaintiff admitted he could complete chores, prepare simple meals, help his son before school, and play video games, (R. 8, PageID.50); he also handled his own personal care, (R. 8, PageID.175-176), complaining only that he struggled to bend to reach his feet, (R. 8, PageID.73.) Thus, no evidence rises to the level of ineffective fine and gross movement issues.

In sum, the record lacks evidence that Plaintiff's impairments are in the same

ballpark as those required by listing 1.02. It is not simply that evidence cuts each way, such that the ALJ could have found substantial evidence for his decision—rather, the problem with this argument (which again, Plaintiff does not actually develop) is that the ALJ could not have found substantial evidence to conclude that Plaintiff met or equaled listing 1.02(B).

Listing 1.04 addresses "[d]isorders of the spine," such as degenerative disc disease, that "result[] in compromise of a nerve root (including the cauda equina) or the spinal cord." 20 C.F.R. pt. 404, subpt. P, App. 1-Part-A1, § 1.04 (Sept. 2016). In addition, one of three showings must be made:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> Or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>
> Or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

*Id.* The Sixth Circuit discussed the "strict requirements" of 1.04A and B in *Lawson v. Comm'r of Sec. Sec.*, 192 F. App'x 521, 529, 530 (6th Cir. 2006). The former "requires a finding of limitation of motion of the spine and loss of motor reflex." *Id.* at 529. Because

the plaintiff's reflexes and range of motion were normal in *Lawson*, she did not meet that listing. *Id.* at 529-530. The latter listing, 1.04(B), is not satisfied by a "bare assertion" that a physician diagnosed "'severe' degenerative disc disease" without the specific medical findings required by the listing. *Id.*

Here, evidence of degenerative disc disease exists, but no medical imaging tests suggest compromised nerve roots. Plaintiff also fails to meet or equal any of the three additional alternative requirements. Regarding listing 1.04(A), as noted, nothing indicates nerve root compression, and of his three straight-leg raise tests, only one came back positive. (R. 8, PageID.294, 309, 364.) Even if one out of three tests sufficed, Plaintiff's strength and reflexes were almost always normal—the one confusing exception being a report stating his legs were numb *or* weak. (R. 8, PageID.214, 217, 309, 332.) Regarding listings 1.04(B) and (C), neither the imaging studies nor other records discuss any malady approaching spinal arachnoiditis or pseudoclaudication; Plaintiff does not suggest that any records show undiagnosed symptoms of these conditions. Burning sensations or the like are also not mentioned in the record. Consequently, he cannot demonstrate equivalence to listing 1.04.

While courts should not lightly dispense with the requirement for expert opinion on equivalence, here the error cannot be considered harmful. Evidence of equivalence cannot be squeezed out of the thin medical record, especially with the barebones—at best—argument Plaintiff offers in his brief. I suggest, then, that this is the rare case where remand is not required.

### 3. VE Testimony

Plaintiff's final argument, in its totality, is this:

> The ALJ improperly relied on the opinion of the Vocational Expert
> that Plaintiff was capable of performing light work with a sit stand option
> because the Vocational Expert was unable to provide testimony regarding
> the existence of light work within the Plaintiff's limitations. In the
> Hypothetical proffered by Plaintiff's council [*sic*], the Vocational Expert was
> unable to give an opinion regarding the number of positions that would
> provide for accommodations. Specifically orthopedic appliances. This was
> an important factor as related to Plaintiff's residual functional capacity,
> especially where the medical evidence indicated that he suffered with chronic
> pain, had difficulties when siting, standing, bending and flexing his spine.

(R. 14, PageID.397.)

This argument misses the mark. The ALJ can rely on the VE's responses to

hypotheticals that accurately portrays a claimant's limitations. *Pasco v. Comm'r of Soc.*

*Sec.*, 137 F. App'x 828, 845 (6th Cir. 2005) (citing *Varley v. Sec'y of Health & Human*

*Servs*, 820 F.2d 777, 779 (6th Cir. 1987)). But no one thinks that ALJs must pose

hypotheticals with *inaccurate* limitations. So Plaintiff's argument comes down to the need

for an orthopedic appliance: If he required one, and the VE could not testify to the

corresponding number of jobs available, the ALJ's decision might be in trouble. If he did

not, then the VE's inability to answer this hypothetical is irrelevant.

Aside from noting unspecified "medical evidence" about his pain and difficulties

sitting and standing, Plaintiff does not take up the relevant inquiry into his need for an

orthopedic appliance. He would be hard pressed if he tried. The only mention of the

appliance—vaguely described as a comfort-producing "bio-mechanical chair"—came

during counsel's questioning. (R. 8, PageID.82-84.) But Plaintiff never said he needed one

29

and his doctors never prescribed one. His only assistive device was glasses. (R. 8, PageID.180.)

The medical evidence demonstrates back and shoulder pain, but typically normal motor skills, gait, strength, and reflexes. (R. 8, PageID.214, 309.) One of the only exceptions to this generalization was a cryptic note stating, "Low Back Numbness or Weakness Thigh and Leg and Right and Left." (R. 8, PageID.332.) Neither from this, nor from the other evidence, could one divine the need for a bio-mechanical chair. The closest the record comes is Plaintiff's self-reports that he sat on his couch and sometimes rested in bed during the day. (R. 8, PageID.74-75.) But Plaintiff does not contest the ALJ's credibility determination casting doubt on his self-reports or point out any other flaws in the ALJ's reasoning.

Simply put, there is not much in the medical record to begin with, even less of it supports the drastic limitations claimed by Plaintiff, and none of it shows the need for a special orthopedic chair.

### H.   Conclusion

For these reasons, I conclude that substantial evidence supports the ALJ's decision. Consequently, I recommend **DENYING** Plaintiff's Motion, (R. 14), **GRANTING** the Commissioner's Motion, (R. 17), and **AFFIRMING** the Commissioner's final decision denying benefits.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and

file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  January 29, 2019               S/ PATRICIA T. MORRIS
                                       Patricia T. Morris
                                       United States Magistrate Judge

## **CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: January 29, 2019                      By s/Kristen Castaneda
                                            Case Manager

32